IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
MICHAEL W. COTTER
United States Attorney

MICHAEL S. SHIN
Assistant United States Attorney
District of Montana
2929 3rd Avenue N., Suite 400
Billings, MT  59101
(406) 247-4669 (telephone)
(406) 657-6989 (fax)
michael.shin@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. CV 12-_____ |
| v. | **COMPLAINT** |
| MONTANA WASTE SYSTEMS, INC. | |
| Defendant. | |

The UNITED STATES OF AMERICA, by authority of the

Attorney General of the United States, acting at the request of the

Administrator of the United States Environmental Protection Agency,

pursuant to Section 3008(a)(1) of the Resource Conservation and Recovery Act and the Montana Hazardous Waste Act, alleges the following:

## NATURE OF THE ACTION

1.    This is a civil action seeking the assessment of civil penalties for violations of the Resource Conservation and Recovery Act ("RCRA"), Subtitle C, 42 U.S.C. §§ 6901-39, and the Montana Hazardous Waste Act ("MHWA"), Montana Code Annotated ("MCA") § 75-10-401 *et seq.*, and regulations promulgated under those statutes, arising from the unlawful generation, transport, storage, and disposal of over 1,600 tons of hazardous waste that was deposited at the High Plains Sanitary Landfill in Floweree, Montana.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the subject matter of this action and the parties under 28 U.S.C. §§ 1331, 1345, & 1355 and 42 U.S.C. § 6928(a).

3.    Venue is proper in this judicial district pursuant to RCRA Section 3008(a), 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1391(b)-(c) & 1395(a) because this action arises from violations of the relevant

2

statutes and the implementing regulations promulgated thereto, the violations occurred in this District, and Defendant does business in this District and/or is found within this District.

4.    The United States Department of Justice has authority to bring this civil enforcement action pursuant to 28 U.S.C. §§ 516 & 519.

## PARTIES

5.    The United States of America is acting through the Attorney General of the United States and on behalf of the United States Environmental Protection Agency ("EPA").

6.    Defendant Montana Waste Systems, Inc. ("MWS") is incorporated in the state of Washington and is licensed to do business in Montana.  MWS is, and at all times relevant to this action has been, the owner and operator of the High Plains Sanitary Landfill located at 142 Powerline Road in Floweree, Montana.  MWS is a "person" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

## STATUTORY AND REGULATORY BACKGROUND

7.    Federal regulation of hazardous waste is primarily based on RCRA, enacted on October 21, 1976 to amend the Solid Waste Disposal Act, and on the Hazardous and Solid Waste Amendments ("HSWA"),

enacted by Congress in 1984 to further amend the Solid Waste Disposal Act.  RCRA establishes a "cradle-to-grave" program to be administered by the Administrator of EPA and by authorized states for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste.  *See* 42 U.S.C. § 6901 *et seq.*

8.     RCRA's Subchapter III (RCRA §§ 3001-23, 42 U.S.C. §§ 6921-40, known as "Subtitle C") requires EPA to promulgate regulations establishing performance standards applicable to facilities that generate, transport, treat, store, or dispose of hazardous wastes. Together, RCRA Subtitle C and its implementing regulations, set forth at 40 C.F.R. Parts 260-79, comprise EPA's RCRA hazardous waste program.

9.     Pursuant to its authority under Subtitle C of RCRA, 42 U.S.C. § 6922(a), EPA has promulgated regulations applicable to: (1) solid and hazardous waste generators, 40 C.F.R. Parts 261 and 262; (2) owner/operators of hazardous waste facilities, 40 C.F.R. Parts 264 and 265; and (3) land disposal of solid and hazardous waste, 40 C.F.R. Part 268.

10.     RCRA Section 3006, 42 U.S.C. § 6926, allows the

Administrator of EPA to authorize a state to administer its own hazardous waste program in lieu of the federal program when the Administrator deems the state program to be equivalent to and consistent with the federal program.

11.   Pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), EPA granted final authorization to the state of Montana to administer and enforce a hazardous waste program on July 25, 1984, and on December 26, 2000, EPA authorized the Montana Department of Environmental Quality ("MDEQ") to implement a corrective action program under the Hazardous and Solid Waste Amendments of 1984. The statutory provisions of MHWA are set forth in Title 75, Chapter 10, Part 4 of the Montana Code Annotated ("MCA").

12.   Pursuant to MCA § 75-10-405, MDEQ has adopted regulations governing hazardous waste, which are found in Chapter 53 of Title 17 of the Administrative Rules of Montana ("ARM").  Unless otherwise specified, MDEQ has adopted and incorporated by reference into its hazardous waste regulations all federal regulations cited in this Complaint.

13.   Pursuant to ARM § 17.53.301, MDEQ has adopted by

5

reference the definitions that are set forth in 40 C.F.R. Part 260 through 40 C.F.R. Part 270.

14.    Pursuant to 40 C.F.R. § 261.2, "solid waste" is defined as any discarded material that is not otherwise excluded under 40 C.F.R. § 261.4(a) or that is not excluded by a variance or by a non-waste determination.  A "discarded material" is any material which is abandoned, recycled, inherently waste-like, or a military munition, and materials are "abandoned" by being disposed of, burned or incinerated, or accumulated, stored, or treated (but not recycled) before, or in lieu of, being abandoned by being disposed of, burned, or incinerated.

15.    A solid waste is a hazardous waste if it is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b) and it exhibits any of the characteristics of hazardous waste identified in Subpart C of 40 C.F.R. Part 261 or it is listed in subpart D of 40 C.F.R. Part 261.  *See* 40 C.F.R. § 261.20.  Characteristic hazardous wastes are assigned "D" codes in 40 C.F.R. Part 261 Subpart C depending on the specific hazardous characteristic that the waste exhibits.

16.    Pursuant to 40 C.F.R. § 261.24, a solid waste exhibits the "characteristic of toxicity" and therefore constitutes hazardous waste if

it contains any of the contaminants listed in § 261.24 at or above concentrations specified in § 261.24.

17.     Pursuant to 40 C.F.R. § 261.24, lead is a contaminant that has been assigned the EPA hazardous waste number D008, and a solid waste constitutes a hazardous waste if the lead concentration in the waste exceeds 5.0 mg/L (5.0 parts per million (ppm)).

18.     Pursuant to 40 C.F.R. § 260.10, a "generator" is defined as "any person, by site, whose act or process produces hazardous waste identified or listed in part 261 of this chapter or whose act first causes a hazardous waste to become subject to regulation."

19.     EPA's and MDEQ's regulations (as relevant to this lawsuit) set forth certain requirements for waste treatment prior to placement or disposal of hazardous waste on land, 40 C.F.R. Part 268 and ARM § 17.53.1101.

20.     Facilities that treat or store hazardous waste in piles must maintain the piles in units that meet certain specifications set forth in 40 C.F.R. §§ 265.251-265.260 and ARM § 17.53.901.

21.     Pursuant to RCRA Sections 3005(a)-(d), 42 U.S.C. § 6925(a)-(d), 40 C.F.R. §§ 270.1(b) & (c), and ARM § 17.53.1101, facilities that

7

treat, store, or dispose of hazardous waste are required to obtain a

permit in order to operate lawfully, unless they are authorized to

operate under "interim status" conferred under RCRA Section 3005(e),

42 U.S.C. § 6925(e).

22.    Section 3008 of RCRA, 42 U.S.C. § 6928, vests EPA with

jurisdiction to enforce the provisions of RCRA and its regulations and

the federally-approved Montana hazardous waste program by filing a

civil action in United States District Court seeking civil penalties  not to

exceed $25,000 per day per violation, and injunctive relief.

23.    Pursuant to the Federal Civil Penalties Inflation Adjustment

Act of 1990, 28 U.S.C. § 2471, as amended by 31 U.S.C. § 3701, and as

provided in 40 C.F.R. Part 19, the amount specified in the foregoing

paragraph increases to $32,500 per day for each violation occurring on

or after March 15, 2004 and further increases to $37,500 per day for

each violation occurring after January 12, 2009.  Each day of such

violation constitutes a separate violation pursuant to Section 3008(g) of

RCRA, 42 U.S.C. 6928(g).

24.    Prior to commencing this civil action, the United States

provided notice to the state of Montana as required by 42 U.S.C. §

8

6928(a)(2).

## GENERAL ALLEGATIONS

25.    At all times relevant to this action, Steel Etc., LLP ("Steel

Etc.") operated as a steel salvage and recycling company in Great Falls,

Montana and James Filipowicz ("Filipowicz") and Eugene Shumaker

("Shumaker") were partners of Steel Etc.

26.    At all times relevant to this action, The Three W's, Inc.

("Three W's") was the owner of property (the "Facility"), which is located

at 302 3rd Street South in Great Falls, Montana and Ted Weissman

("Weissman") was the President of Three W's.

27.    The Facility formerly served as a salvage yard, and in or

around the 1960's, the Facility was the site of a "battery-cracking"

business, in which lead acid batteries were broken to recover the metals

on them.  As part of the battery-cracking operation, battery cases and

acid contaminated with lead were deposited into the ground in an area

within the Facility.  Filipowicz formerly worked as a yard manager at

the Facility and was familiar with the battery-cracking operations.

28.    In or around December of 2000, Steel Etc. and Three W's

entered into a lease agreement pursuant to which Steel Etc. operated a

recycling company at the Facility.

29.    In or around 2003, Three W's retained Higgins Consulting Engineers, LLC ("Higgins Consulting") to perform a "Phase II Environmental Site Assessment" at the Facility.

30.    Higgins Consulting prepared a report dated June 3, 2005 detailing the results of the assessment.  The report stated that the purpose of the assessment was "to evaluate the potential for hazardous substances and/or petroleum products to exist" at the Facility.

31.    The report further stated:  "No investigation is thorough enough to exclude the presence of hazardous substances at a given location.  If hazardous substances or recognized environmental conditions were not identified during the Phase II ESA, such a finding should not be construed as a guarantee of the absence of such hazardous substances or recognized environmental conditions but, rather, the result of the services provided, including Higgins Consulting Engineers' professional judgment, within the scope, limitations, and cost of the work performed."

32.    The report also stated the following concerning "Site 1 – Scrap Yard," the area of the Facility in which Steel Etc. was operating

10

its recycling business:

> Lead was also detected in the above five samples and
> ranged in concentration from 5ppm in TP-6 at a
> depth of 8.5' to 698 ppm in TP-11 at a depth of 2'.
> None of these concentrations were above the PRG of
> 750 ppm.  However, the lead concentrations found at
> the 2-foot level near the shearing pad might indicate
> that an elevated risk to human health or the
> environment was present in that area due to lead.
> Based on visual observations of subsurface soils
> made at the time of the field investigation, the lead
> impacts do not appear to extend to a significant
> depth.  Further testing would be necessary in order
> to confirm this hypothesis, or not.  Therefore, a
> definite conclusion with respect to the risk to human
> health and the environment could not be made with
> the data obtained during this Phase II ESA.

33.     The report found the presence of lead in "Site 2 – Northwest
Fence," which was at the northern portion of the Facility.  The report
stated that a high of 29,000 ppm was found in one of the samples, which
contained corroded material.  The report stated that "the high
concentration of lead in this material appears to present a significant
risk to human health and the environment if left in place."

34.     Sometime in 2005, Steel Etc., with the permission of Three
W's, decided to install a large shear on the leased premises at the
Facility.  In or around August of 2005, Shumaker Trucking began

excavating the soil and associated waste where a concrete pad for the shear was to be installed.  Higgins Consulting contacted the High Plains Sanitary Landfill (the "Landfill") in Floweree, Montana for disposal of the excavated waste.

35.    On or around August 11, 2005, Skip Higgins ("Higgins"), the owner of Higgins Consulting, sent an email to Greg Wennerberg ("Wennerberg"), the Operations Manager of the Landfill, and Roger Bridgeford ("Bridgeford"), a regional manager for MWS, regarding the storage and disposal of the excavated waste.  The email contained as attachments lab reports indicating that total lead levels in two samples taken from the excavated area were 9 mg/kg and 104 mg/kg.

36.    A standard industry "rule of thumb" is that total lead figures are approximately 20 times greater than levels analyzed through toxicity characteristic leaching procedures ("TCLP"), which is the measure required to determine compliance with RCRA regulations. Using the 20:1 ratio, the 104 mg/kg sample would have exceeded the regulatory limit and the excavated materials would have therefore constituted hazardous waste under RCRA.  A TCLP test, however, was not conducted at that time.

12

37.    The Landfill representatives were aware of the rule of thumb at the time they received the email from Higgins Consulting. Wennerberg attached to a printout of the email from Higgins a Post-It note  that stated:  "Cannot use totals — need TCLP."

38.    Wennerberg told Higgins that the Landfill required a TCLP analyses for metals in the excavated waste.

39.    In a letter dated August 25, 2005 sent by email, Higgins wrote to Weissman regarding estimated cost of removal of the excavated waste.  Higgins included as a listed "task":  "Collect and analyze characterization samples of excavated materials.  This is a MWS requirement."  The letter also stated that analyses of the samples would at a minimum use "RCRA Metals by TCLP," among other tests.

40.    On or around August 30, 2005, Higgins met with Wennerberg, Bridgeford and Shumaker, who in addition to being a partner of Steel Etc. was the owner of Shumaker Trucking and Excavating Contractors, Inc. ("Shumaker Trucking"), to discuss the transport and disposal of the excavated waste.  Wennerberg reiterated the need for a TCLP analyses and also stated that the Landfill  would require a signed generator waste profile.

13

41.    On or around August 31, 2005, Higgins took two samples from the excavated waste pile and sent them for a TCLP metal analysis.

42.    On or around September 1, 2005, Higgins faxed a copy of a Generator's Waste Profile Sheet, signed by Weissman, to Wennerberg. The form indicated that the waste to be delivered to the Landfill was not hazardous waste and contained lead levels between 0% and .05%. Under the signature line of the form, a box stating "Check if additional information is attached" was checked and the words "Lab Results" were written in below.

43.    Upon receipt of the Generator's Waste Profile Sheet, Wennerberg made the following notation:  "Not Approved Need TCLP Waiting For Lab Results We Will Stockpile Dirt Start 9-6-05."

44.    Between around September 6, 2005 and September 15, 2005, Shumaker Trucking transported the excavated waste to the Landfill and placed it on the edge of a solid waste landfill cell.

45.    According to Landfill documents, Shumaker Trucking delivered a total of 71 loads containing 1,674 tons of excavated waste to the Landfill.

14

46.    The waste pile was not protected from erosion, runoff, and wind- blown deposition, so continuing disposal occurred.

47.    In or around late September or early October of 2005, Higgins Consulting received results from the testing of the samples that Higgins had taken from the waste pile at the Facility on August 31, 2005.  The TCLP results for the two samples were 30.5 ppm lead and 8.86 ppm lead, above the 5.0 ppm  regulatory limit that establishes lead-contaminated waste as a characteristic hazardous waste.  Upon receiving the results, Higgins emailed them to Weissman.

48.     On or around May 23, 2006, Higgins, at the direction of Weissman, took two additional samples from the excavated waste at the Landfill.  Results of TCLP analysis of those samples indicated lead levels of 30.8 ppm and 20.4 ppm.  Higgins relayed the results to Weissman and Wennerberg.

49.    In or around June of 2007, counsel for Three W's notified MDEQ of the hazardous waste at the Landfill.

50.    On or around June 22, 2007, MDEQ conducted a compliance evaluation inspection at the Landfill with Bridgeford, Wennerberg, Filipowicz, and Shumaker present.  Filipowicz told an MDEQ official in

15

a call prior to the inspection that the former lead battery-cracking operation at the Facility was at the same location from which the excavated materials were taken, and he confirmed during the inspection that debris in the pile at the Landfill included broken lead-acid battery parts.

51.    In or around July 2009, EPA's National Enforcement Investigation Center ("NEIC") documented site conditions of the excavated waste at the Landfill, obtained representative samples of the waste, and measured in-situ elemental metal concentrations using a portable X-ray flourescence spectroscopy instrument.

52.    NEIC observed and photographed the waste pile, in which numerous lead-battery parts were visible.

53.    Based on a TCLP analysis performed on eight samples that were collected by NEIC, lead levels exceeded the regulatory limit of 5 mg/L in all eight samples, with a range from 7.3 mg/L to 42.7 mg/L and an average concentration of 27.7 mg/L.

54.    Based the results of the X-ray flourescence ("XRF") testing, among other testing and results, NEIC concluded that the lead in the excavated waste was from the recycling of lead batteries and not from

other sources.  In particular, NEIC found that the strong correlation of lead with antimony in the waste indicated that the lead was from lead-acid batteries.

55.    The excavated hazardous waste remained untreated at the Landfill until around September 2009.

56.    In or around September 2009, with the approval of MDEQ, the excavated hazardous waste was treated at the Landfill.

## CLAIMS FOR RELIEF

### First Claim for Relief –
### Land Disposal of Hazardous Waste That Does Not Meet Treatment Standards

57.    The allegations set forth in paragraphs 1 through 56 above are incorporated herein by reference.

58.     40 C.F.R. § 268.40 and ARM § 17.53.1101 prohibit the land disposal of hazardous waste that does not meet the requirements set forth in 40 C.F.R. § 268.40.

59.    From in or around September 2005 to July 2009, Defendant land disposed of hazardous waste that did not meet the requirements set forth in 40 C.F.R. § 268.40.

17

60.   Accordingly, Defendant violated RCRA Subtitle C, 40 C.F.R. § 268.40, and ARM § 17.53.1101.

61.   Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

62.   Defendant is liable for civil penalties pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(a), for each of the above violations.

**Second Claim for Relief –
Disposal and Storage of Hazardous Waste at a Facility that
Did Not Have a RCRA Hazardous Waste Permit**

63.   The allegations set forth in paragraphs 1 through 62 above are incorporated herein by reference.

64.    40 C.F.R. §§ 270.1(b) & (c) prohibits the disposal or storage of hazardous waste by any person who has not applied for and received a RCRA permit.

65.   From in or around September 2005 to July 2009, Defendant stored and disposed of hazardous waste at the Landfill, which was a solid waste landfill that did not have a RCRA permit for the storage and disposal of hazardous waste.

66.   By storing and disposing of hazardous waste at a landfill

that did not meet RCRA requirements, Defendant violated RCRA Subtitle C, 42 U.S.C. § 6925(a), and 40 C.F.R. §§ 271(b) & (c).

67.    Each day that Defendant unlawfully stored and disposed of hazardous waste constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

68.    Defendant is liable for civil penalties pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(a), for each of the above violations.

### Third Claim for Relief – Storage of Hazardous Waste in a Substandard Waste Pile

69.    The allegations set forth in paragraphs 1 through 68 above are incorporated herein by reference.

70.    40 C.F.R. §§ 265.251-265.260 and ARM § 17.53.901 set forth requirements for owners and operators of facilities that treat or store hazardous waste in piles, including protection from wind (§ 265.251), containment (§ 265.253), design and operating requirements (§ 265.254), action leakage rate (§ 265.255), response actions (§ 265.259), and monitoring and inspection (§ 265.260).

71.    From in or around September 2005 to July 2009, Defendant stored hazardous waste in a pile at the Landfill that did not meet the

19

minimum requirements set forth in 40 C.F.R. §§ 265.251-265.260.

72. Accordingly, Defendant violated RCRA Subtitle C, 40 C.F.R. §§ 265.251, 265.253, 265.254, 265.255, 265.259, & 265.260, and ARM § 17.53.901.

73. Each day of such violation constitutes a separate violation pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(g).

74. Defendant is liable for civil penalties pursuant to Section 3008(g) of RCRA, 42 U.S.C. § 6928(a), for each of the above violations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff United States of America respectfully requests that this Court grant the following relief:

a. Find Defendant liable for the foregoing violations;

b. Assess civil penalties against Defendant for up to the amounts provided pursuant to Sections 3008(a) and 3008(g) of RCRA, 42 U.S.C. §§ 6928(a) and 6928(g);

c. Award the United States its costs in bringing this action; and

d. Award the United States any and all further relief that this Court deems just and proper.

20

DATED:    December 5, 2012

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

MICHAEL W. COTTER
United States Attorney for the
District of Montana


 /s/  Michael S. Shin
MICHAEL S. SHIN
Assistant United States Attorney


Of counsel:

SHELDON MULLER
Senior Attorney
United States Environmental Protection Agency
1595 Wynkoop Street
Denver, CO  80202
(303) 312-6916 (telephone)
(303) 312-6953 (fax)
muller.sheldon@epa.gov